UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA            :

    - v. -            :            S(7)R 98 Cr. 1023 (KTD)

MOHAMED RASHED DAOUD AL-'OWHALI,   :

        Defendant.            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

### GOVERNMENT'S MEMORANDUM OF LAW IN CONNECTION WITH THE SECOND CIRCUIT'S REMAND FOR THIS COURT TO CONDUCT PROCEEDINGS ON THE VOLUNTARINESS OF MOHAMED RASHED DAOUD AL-'OWHALI'S CONFESSION

#### Preliminary Statement

The Government respectfully submits this memorandum of law in connection

with the remand of this case by the Second Circuit. Specifically, after affirming the conviction of

defendant Mohamed Rashed Daoud al-'Owhali on numerous terrorism offenses arising from his

participation in the coordinated bombings of the U.S. embassies in Kenya and Tanzania in 1998,

the Circuit remanded the matter, in light of a recent Government disclosure, for the limited

purpose of "conducting proceedings on the voluntariness of the [defendant's] confession." As

set forth in the remainder of this submission, a review of the information that prompted that

disclosure, as well as more recent information obtained by the Government, makes plain that

there is no need for a hearing on the voluntariness of al-'Owhali's confession.

As detailed *infra* in the Statement of Facts, the Government's disclosure

concerned statements of a witness to certain of al-'Owhali's debriefings, namely, an interpreter

who participated in the first three days of the interviews, more than a week before al-'Owhali

confessed to participating in the bombings.  The interpreter made the statements earlier this year — 11 years after she translated for al-'Owhali — as part of a routine reinvestigation conducted by her employer, a U.S. Government agency.  A summary of the interviewer's statements indicated that the interpreter had recalled hearing sounds that led her to believe al-'Owhali was being beaten by his interviewers.  Notably, however, al-'Owhali himself had never claimed that he was beaten during the interviews, and Judge Sand had concluded after exhaustive proceedings that al-'Owhali had neither been mistreated or abused in any way.  Nonetheless, in an abundance of caution, the Government disclosed the summary of the interview to the defense while continuing to investigate the matter.

Subsequent investigation has revealed that the summary disclosed to the defense was inaccurate in several material respects, and that the interpreter did *not* say during her reinvestigation interview that she believed al-'Owhali was being beaten.  As a preliminary matter, the interpreter was not in the room with al-'Owhali during the interview — she was in an adjoining room, cordoned off by a curtain to preserve her anonymity — so she could only hear, but not see, what was happening in the interview room.  From this vantage point, as the videotape of the reinvestigation interview makes clear, the interpreter could not and did not surmise about what was actually happening in the interview room.  Indeed, contrary to the interviewer's summary, the interpreter stated that she could *not* conclude from what she heard that al-'Owhali was being beaten.

The summary of the interview that was disclosed to the defense is, as conceded by its author, inaccurate in certain material respects.  These inaccuracies are demonstrated by a comparison of the summary to the actual reinvestigation interview.  For one thing, the interpreter

recalled during the reinvestigation interview that she heard banging sounds coming from the room where al-'Owhali was being questioned. The prior proceedings before Judge Sand contained extensive testimony from the interviewing agents about what those sounds were, *i.e.*, the throwing of a water bottle and swatting at flies, and al-'Owhali never disputed this testimony. Significantly — and contrary to the summary — the interpreter did not say that those sounds permitted her to conclude that al-'Owhali was being beaten; rather, as is clear from the videotape, she actually said that she could *not* draw such a conclusion. At another point in the reinvestigation interview, the interpreter recalled that al-'Owhali exclaimed to her, "sister, please make them stop beating me." The summary suggests that the interviewer was alarmed by the exclamation, reporting that she became terrified upon hearing it and ran from the room. This, too, is inaccurate. For starters, the chronology is incorrect: the interviewer recalled the sequence of events to be that she heard the banging, ran from the room (because she feared that al-'Owhali might emerge through the curtain), and then heard al-'Owhali's purported exclamation after returning to the room. The interviewer did not recall reacting in any way to the exclamation and certainly did not recall running from the room because of it.

More fundamentally, the interpreter's demeanor on the videotape strongly suggests that she did not seriously think that al-'Owhali was being beaten. The commotion permitted the interpreter, at most, to consider the theoretical possibility (suggested by the interviewer) that al-'Owhali might be being beaten. Her guesswork as to what might have happened in the interview room is evident in parts of the reinvestigation interview. But the interpreter was clearly not in a position to provide competent and reliable testimony on the issue

of the voluntariness of al-'Owhali's confession, and did not suggest otherwise during the interview.

The interpreter's guesswork is not new to the Government.  As explained below, the interpreter had told the Government before the suppression hearing that she thought al-'Owhali might have been mistreated based on a loud noise that came from the interview room. No disclosure was made to the defense, however, because: (1) the interpreter acknowledged almost immediately after making the statement that she did not think the sounds meant that al-'Owhali was being beaten and that they could have be caused by any number of things; (2) she appeared to be searching for ways to avoid testifying; (3) the interrogating agents credibly denied beating al-'Owhali when confronted by the Government with the interpreter's suggestion; and (4) as noted above, al-'Owhali himself had never accused the agents of beating him.

In sum, while the summary of the reinvestigation interview may have been appropriately disclosed to the defense — even though it suggested claims that the defendant himself had never raised during the preceding 11 years — the review of the source material for that summary makes clear that it was inaccurate.  More importantly, a review of the interview itself, along with the evidence developed before Judge Sand, underscores that his findings on the voluntariness of al-'Owhali's confession were entirely appropriate, and that there exists today no genuine issue of material fact that warrants a hearing.

## RELEVANT FACTS

A.    **Background**

1.    **Overview**

On August 7, 1998, a team of al Qaeda members successfully carried out the nearly simultaneous bombings of the U.S. embassies in Nairobi, Kenya and Dar es Salaam, Tanzania. Al-'Owhali was an integral part of the operation — the trial evidence proved that he: (1) swore allegiance to Bin Laden in Afghanistan; (2) was tasked there for a martyrdom operation in East Africa, in which he would help place a truck full of explosives at an American target and help detonate those explosives; (3) shot a martyrdom video in Pakistan in which he claimed responsibility for this mission; (4) traveled to Nairobi five days before the bombings to carry out the mission; (5) met in Nairobi with plot leaders and learned that there would be two bombings, as well as the exact timing and targets; (6) learned further details about the plans, targets, bombs, bomb-delivery trucks and the other conspirators; (7) reconnoitered the Nairobi embassy three days before the bombing with a coconspirator to determine how best to place the bomb; (8) was present when the final connections for the Nairobi bomb were made; (9) was the sole passenger in the bomb-delivery truck, assigned to help the driver get the truck bomb as close to the Nairobi embassy as possible; and (10) leapt from the truck as it reached the embassy grounds, throwing several homemade stun grenades to scatter the "innocents" (non-Americans) and prompt a guard to open a gate to allow the bomb truck to be positioned closer to its target. Al-'Owhali was knocked down by the blast and was taken by ambulance to a hospital, where he checked in using a false name. He washed his fingerprints from the keys to the bomb truck and left them in a hospital bathroom, along with bullets from the gun he carried during the attack and which was

5

subsequently found in the bomb crater. He then hid in a Nairobi hotel for several days, trying to summon help from al Qaeda.

On the morning of August 12, 1998, officers from the Kenyan Criminal Investigation Department ("CID") arrested al-'Owhali inside the Nairobi hotel based on a tip. Accompanied by three members of the FBI-NYPD Joint Terrorist Task Force — FBI Agents Steven Gaudin and Steven Bongardt and NYPD Detective Wayne Parola — the Kenyan officers transported al-'Owhali to CID headquarters, where he was interviewed beginning later that morning. Al-'Owhali did not confess during that interview session, or in subsequent sessions on August 13, 14, 17 and 21. He did, however, provide a full confession over an ensuing four-day period — August 22, 23, 24 and 25 — after which he was transported by plane to the United States on August 26, and was arraigned on the following day in the Southern District of New York.

### 2.    Judge Sand's Initial Suppression Decision

On October 13, 2000, al-'Owhali moved to suppress his statements, including his detailed confession, on grounds: (1) that he had not received constitutionally adequate warnings prior to answering questions posed by U.S. law enforcement agents; and (2) because of the conditions of his confinement and threats made by the agents, his statements were not voluntarily made. With regard to the latter claim, al-'Owhali did not contend that he had been beaten or physically mistreated during the course of his interrogation, only that the agents had shouted at him, threatened him and his family with violence, and threw a container of water that he (al-'Owhali) was drinking to the floor. (Affidavit of Mohamed al-'Owhali, dated October 14, 2000, ¶¶ 9, 14, 19, attached as Exhibit A).

6

Judge Sand held a suppression hearing on December 12 and 14, 2000, shortly before jury selection. By sealed order dated January 9, 2001, the Court granted al-'Owhali's motion, based largely on the Court's interpolation of evidentiary gaps in the record the Government had presented on an expedited basis.[1] The Court first concluded that the Fifth Amendment privilege against self-incrimination applies to statements resulting from the interrogation by U.S. law enforcement officers of a non-citizen held in foreign custody, reasoning that any Fifth Amendment violation arising from an overseas interrogation would actually occur in the United States, when the resulting statements were introduced at trial. (Ex. B, p. 10). Judge Sand also concluded that *Miranda* and its progeny, rather than the due process standard of "voluntariness," provided the proper framework for testing the admissibility under the Fifth Amendment of statements obtained in these circumstances. (*Id.*, p. 13). Applying that framework, the District Court concluded that four factors, considered in combination, rendered al-'Owhali's statements inadmissible.

First, the Court deemed "substantively inadequate" the advice-of-rights form ("AOR") that the agents had read to al-'Owhali on his first day of questioning. The District Court did not, however, consider the fact that al-'Owhali had received additional *Miranda* warnings prior to confessing in the latter interview sessions, and the Court specifically cited the lack of record evidence demonstrating al-'Owhali's "sophistication," "familiarity" with the

---

[1] The Court noted that the opinion was produced under "considerable time pressure" and, further, that the "timing of this decision, coming while the Court and the parties are in the midst of jury selection, is indeed unfortunate." The causes of that delay, the Court explained, "included a change of counsel for al-'Owhali, and his ambivalence as to whether the motion should be made and whether he should testify at the suppression hearing." (January 9, 2001 Opinion of the Honorable Leonard B. Sand, p.1, attached as Exhibit B).

7

mechanics of interrogation, or "full understanding of his rights under *Miranda*." (*Id.*, p. 16).

Second, the Court found the record insufficient to support the Government's assertions that al-

'Owhali had understood the AOR in English and that the form had been accurately translated for

him into Arabic on the first day he was interviewed. (*Id.*, pp. 16-17). Third, the Court concluded

that the record contained "objective indicia that al-'Owhali was unaware of his right to the

assistance of counsel while in Kenya." (*Id.*). Fourth, the Court stated that it was "deeply

troubled by the prolonged incommunicado detention and interrogation of al-'Owhali while in

Kenya." (*Id.*, p. 18). Although the Court rejected al-'Owhali's "claims of threats, physical

abuse, and deprivation of food and sleep," it concluded that the conditions of his confinement

were nevertheless "far from ideal." (*Id.*). For many of the same reasons, the Court also decided

that al-'Owhali's statements were not "voluntary" within the meaning of the Fifth Amendment.

Summarizing its reasoning, the Court concluded that the "totality of the circumstances coalesced

to engender a Hobson's choice for al-'Owhali." (*Id.*, p. 19). Significantly, however, that

conclusion was premised explicitly on the District Court's assumption that through the

"substantively inadequate" AOR, al-'Owhali was told that he had the right to an attorney only if

he were in the United States, and that he could travel to the United States only if he confessed.

(*Id.*, pp. 19-20).

### 3.    The Decision To Re-open The Hearings

On January 16, 2001, before the January 9 opinion had been made final or public,

the Government moved the Court to re-open hearings on al-'Owhali's motion and reconsider its

decision. The motion was based on a lengthy memorandum of law, which was supported by a

75-page affidavit from AUSA Patrick F. Fitzgerald, which set forth in detail specific facts

8

refuting many of the assumptions and findings on which the District Court's January 9 opinion had been based. Among other things, that affidavit (1) catalogued, with supporting exhibits, each interaction between American agents and al-'Owhali from the first moments of his arrest through his arraignment in the Southern District of New York; (2) supplied the evidence the Court deemed critical about the training and qualifications of the Arabic interpreter who first translated the AOR for al-'Owhali; (3) demonstrated al-'Owhali's sophistication, education, knowledge of world events, and extensive training in military matters and counter-interrogation techniques; (4) documented, by reference to notes taken by Fitzgerald, the many occasions on which al-'Owhali had been explicitly advised of his right to counsel; (5) refuted the inference — central to the January 9 opinion — that al-'Owhali's motive for confessing was his desire to obtain access to an attorney in the United States; and (6) detailed the manner in which al-'Owhali controlled the interview sessions and skillfully negotiated the terms of his confession.

On January 17, 2001, the Court withdrew its opinion granting al-'Owhali's motion, and two days later, it granted the Government's request to re-open the hearings, in part because its January 9 opinion "had, based on the record before it, made certain factual assumptions" regarding al-'Owhali's Kenyan detention "which now appear to be inaccurate."

**4.     Facts Adduced at the Hearings**

At the re-opened hearing held on January 23, 2001, the Government presented three witnesses: Special Agent Gaudin, FBI Language Specialist Mike Feghali, and AUSA Fitzgerald. Feghali did not translate, or otherwise participate, during the first three days of interviews. Translation duties during the first three days were handled by the interpreter, whose recent reinvestigation interview is the subject of this motion on remand (hereinafter, the

"Interpreter"). The Interpreter was (and is) employed by a U.S. Government agency. Her

testimony was admitted at the re-opened hearing through stipulation of the parties, as described

below. The full record, after the re-opened hearing, provided a complete picture of al-'Owhali's

background and his experience in Kenyan custody that underscored the factual errors in the

Court's January 9 opinion.

### i.  Al-'Owhali's Background And Characteristics

A member of a prominent and wealthy Saudi family, al-'Owhali was born in 1977

in Liverpool, England, where his father was then enrolled in a Masters degree program.

(September 9, 1998 FBI Report of al-'Owhali's Interviews, p. 2, attached as Exhibit C). Al-

'Owhali completed high school, studied for two years at Mohammed Bin Saud University in

Riyadh, Saudi Arabia, and received extensive instruction in military matters, including counter-

intelligence techniques, while he attended several of Bin Laden's training camps. (*Id.*). Fighting

alongside the Taliban in Afghanistan, al-'Owhali engaged in combat that he described as

"severe" and that required him to spend many nights camped in rugged conditions in the

mountains near Kabul. (*Id.*, pp. 3-4). Al-'Owhali speaks Arabic, including classical dialect, and

limited English. Throughout his interviews in Kenya, he exhibited familiarity with a variety of

political and world events, including the "Kissinger promise" — a plan involving U.S. presence

in the Arabian Gulf — as well as the circumstances surrounding the Clinton-Lewinsky scandal.

(*Id.*, p. 2).

### ii.  The Interviews on August 12, 13 and 14

On August 12, 1998, at the start of the first interview, al-'Owhali was provided

the AOR, which set forth in English *Miranda* rights modified for use in overseas situations.

10

Because al-'Owhali indicated that he could not read English, the interviewers read the form out

loud to him and carefully checked as they did so for signs of comprehension after each

paragraph.  When they finished reading the form, the interviewers asked al-'Owhali whether he

understood what had been explained to him.  Al-'Owhali answered that he did, and he then

signed the form in Arabic.[2]  No interpreter was present for these interactions.

The agents then conducted an interview in English.  (December 12, 2000

Transcript of al-'Owhali's Initial Suppression Hearing, pp. 17-23, attached as Exhibit F).

Although al-'Owhali was able to convey a false exculpatory story replete with specific details,

and although he never requested a translator (*Id.*, p. 23), Agent Gaudin concluded that

subsequent interviews would proceed more efficiently with an Arabic interpreter.  (*Id.*, p. 23; Ex.

E, ¶ 14; January 23, 2001 Transcript of al-'Owhali's Re-Opened Suppression Hearing, pp. 10-11,

attached as Exhibit G).  Agent Gaudin therefore ended the session after roughly one hour and

recommended the interview with the Interpreter later the same afternoon.  (Ex. E, ¶ 14; Ex. F, pp.

23-24; August 31, 1998 FBI Report of al-'Owhali's Interviews, p. 1, attached as Exhibit H).

The parties' stipulation addressed the Interpreter's qualifications and the

testimony she would provide at a hearing.  (January 24, 2001 Stipulation, attached as Exhibit I).

Specifically, the Interpreter grew up in a Middle Eastern country, where she spoke Arabic as her

---

[2] The AOR form — a copy of which is attached as Exhibit D — was not drafted
exclusively for al-'Owhali or other suspects interviewed in connection with the embassy
bombings; rather, it was faxed to Kenya from Washington, D.C., and had been first administered
in that country on August 11, 1998, the day before al-'Owhali was arrested, by an FBI agent who
understood that it had been previously approved for use in unrelated overseas interviews.
(January 16, 2001 Affirmation of Patrick J. Fitzgerald, ¶ 8, attached as Exhibit E).  As the Court
found, the AOR form was thus one that "had been used abroad extensively by Assistants in the
field without challenge" prior to the interviews in this case.  *United States* v. *Bin Laden*, S7 98
Cr. 1023 (LBS), 2001 WL 1160604, at *9 (S.D.N.Y. Oct. 2, 2001).

first language.  She had also spoken English for 20 years, having come to the United States after

completing high school.  (*Id.*).  Al-'Owhali also spoke in classical Arabic, and they had no

difficulty understanding one another.  (*Id.*).  In particular, when the Interpreter translated the

AOR form for al-'Owhali, he explicitly stated that he understood what she had explained to him.

(*Id.*).  Al-'Owhali also volunteered that he understood that the explanation of rights he was read

in Arabic that afternoon was the same advice he had received earlier that day.  (Ex. F., p. 25).

Beginning on August 12, and continuing on August 13 (from about 4:00 to 8:00

p.m.) and on August 14 (from about 4:30 to 7:00 p.m.), al-'Owhali lied to the agents about his

identity, his age, his background, his involvement in the Nairobi bombing, and the whereabouts

of his accomplices to that crime.  The Interpreter translated during these sessions.  Among other

falsehoods, al-'Owhali claimed that he was an unsophisticated drug salesman from Yemen who,

during the days prior to the bombing, had stayed at the house of a friend who he believed had

died in the attack.  (Ex. H, pp. 1-2; August 24, 1998 FBI Report of al-'Owhali's Interviews, pp.

1-2, attached as Exhibit J).  Al-'Owhali acknowledged that he had been in the vicinity of the

embassy when the bomb exploded and stated, consistent with a receipt found on him after his

arrest, that he had been treated at a local hospital for injuries sustained in the blast.  (Ex. F, p. 13;

Ex. H, pp. 1-2).

But al-'Owhali's story also began to shift, as Agent Gaudin pointed out illogical

and contradictory aspects of his account.  In particular, Agent Gaudin asked al-'Owhali about his

assertion that he was in the same clothes that he had been wearing on the day of the bombing and

queried how, if that were true, al-'Owhali's shoes were not dirty and his belt was newly

purchased.  Al-'Owhali admitted that he had lied, remarking to Agent Gaudin, "you're good,"

and smiled in apparent acknowledgment of Agent Gaudin's suggestion that al-'Owhali was practicing the same counter-interrogation techniques that Agent Gaudin had learned in the military. (Ex. E, ¶¶ 17, 42-43). Although he maintained the basic elements of his story, al-'Owhali also admitted during the August 13 interview session that he had requested and received a wire transfer from contacts in Yemen following the bombing, rather than obtaining the money from an uncle in Saudi Arabia, as he had originally asserted. (Ex. E, ¶ 17; Ex. G, pp. 23-24). He became angry when asked how frequently he shaved — a question based on the fact that persons carrying out operations for al Qaeda often shave before traveling to avoid the perceived suspicion among border agents of bearded Muslims — and loudly berated the United States, Israel, and the investigators, whom he called the "enemy" and whom he blamed for what he termed the "accident" of the bombing. (Ex. E, ¶ 18; September 1, 1998 FBI Report of al-'Owhali's Interviews, p. 2, attached as Exhibit K).

> **iii.    The August 17 Interview and al-'Owhali's Threats to the Interviewers**

Al-'Owhali was not interviewed over the weekend of August 15 and 16, 1998. He spent that time in a holding cell at CID Headquarters, where he had reading material (an English-language magazine) for part of the time and where, he concedes, Agent Gaudin visited him and brought him milk upon request. (Ex. E, ¶ 19).

Interviews resumed on August 17. By this time Language Specialist Feghali of the FBI, a native Arabic speaker, had arrived in Nairobi. He translated for al-'Owhali during this interview and on all subsequent sessions in Kenya.[3] At the start of the interview on August 17 —

---

[3] Feghali hailed from Lebanon but had extensive experience translating for persons from Saudi Arabia, having worked from 1981 to 1987 in the United States training Arabic-speaking

which began at 11:30 a.m. and ended around 3:00 p.m. Kenyan time — Feghali read out loud to al-'Owhali, from beginning to end, the AOR that al-'Owhali had signed on August 12 and had seen on August 13 and 14, and al-'Owhali indicated that he remained willing to talk and did not ask for an attorney.  (Ex. G, pp. 83-84).

The August 17 interview continued to focus on inconsistencies in the story to which al-'Owhali had thus far adhered.  Unable to account for several of those contradictions, al-'Owhali again became angry, stating that the "guilty" had been punished and that his "tribe" would exact revenge if he, an innocent man, were prosecuted.  (Ex. F, pp. 37-38).  In particular, al-'Owhali made a number of threats aimed at both the American and Kenyan agents who were then in the interview room: He stated that if he were prosecuted, hostages would be taken, Americans would be slaughtered, and neither American nor Kenyan embassies would be safe.  (Ex. E, ¶ 20; Ex. F, p. 38).  He also specifically threatened to kill the agents and their families.  (Ex. E, ¶ 20).[4]

---

persons (mostly Saudi Arabian) in law enforcement safety and firefighting.  (Ex. G, pp. 73-76).  Feghali, whom Judge Sand termed "eminently qualified" (February 13, 2001 Opinion of the Honorable Leonard B. Sand, p. 6, attached as Exhibit L), had more than eleven years' experience working as a language specialist for the FBI, including serving as translator for Saudi officials attending FBI training in America as well as translating for American officials visiting Saudi Arabia.  In the latter capacity, Feghali would often visit Saudi Arabia for a month at a time.   (Ex. G, p. 78).  When al-'Owhali later arrived in America, he made several requests that Feghali translate for him rather than use the translator provided by the District Court.  (*Id.*, pp. 101-02).

[4]*See* Ex. F, pp. 37-38 (Testimony of Agent Gaudin):

> [H]e said if he was going to be held responsible for this, that his tribe would take revenge, and he pointed directly at [NYPD] Detective Parola and said, "They will come back and kill you and your whole family," and then in a way to point to me, and he placed Detective Parola aside, not in a violent manner but just pushed him aside so he could see me, and he pointed directly at

### iv.   The Identification Parade

American officials did not interview al-'Owhali on August 18, 19, and 20.  During

that time, Kenyan CID officers were preparing to conduct an "identification parade," a procedure

similar to a police "line-up" in the United States.  The identification parade took place on August

20 and was governed entirely by Kenyan rules and regulations, which are more defendant-

friendly than U.S. practices in at least two respects: first, there are more "fillers" than in a

standard U.S. line-up; and second, unlike in the United States, where the witnesses may

anonymously identify the defendant behind a one-way mirror, in Kenya witnesses must

physically tap the suspect on the shoulder.  (Ex. F, pp. 44-45).   Among the six witnesses who

participated in the parade, one identified al-'Owhali as the person that witness saw alight from

the bomb truck, engage in a conversation with embassy security guards, and then throw a stun

grenade.  (Ex. E, ¶ 23).  Because of the nature of the proceeding, al-'Owhali was immediately

aware that he had been identified.

### v.   The U.S. Missile Strikes and the August 21 Interview

At a reception in Nairobi on the evening of August 20, 1998, FBI Director Louis

Freeh announced that the U.S. had that day carried out missile strikes against locations in

Afghanistan and the Sudan believed to be associated with Usama Bin Laden's terrorist network.

(Ex. E, ¶ 27).  As a result of the tense security environment that followed the U.S. strike, on

August 21, 1998, the FBI significantly scaled down its presence in Kenya.  (*Id.*, ¶ 26; Ex. G, p.

15).  Dozens of personnel were dispatched back to the United States, while those who remained

---

me, "and you and your whole family," and he said no embassies
would be safe, not even the Kenyan[s], and that hostages would be
taken.

were told they should be on standby to return.  NYPD Detective Wayne Parola, who had attended

all of the previous Kenyan interviews with al-'Owhali, was among those who left Kenya on

August 21.  (*Id.*).  FBI Agents Gaudin and Bongardt stayed, but they were notified that they

should prepare for a possible departure on short notice.  (Ex. E, ¶ 28; Ex. G, pp. 15-17).

In light of these developments, the agents decided to employ a new approach to

interviewing al-'Owhali: instead of asking him specific questions, as they had done in prior

sessions, the agents requested that he listen while they explained to him the reasons they had

come to suspect his involvement in the embassy bombings.  (Ex. G, pp. 21-27).  At the August

21 session, they confronted al-'Owhali with telephone records of operator-assisted phone calls

made from the Nairobi bomb factory in the name of an alias he had provided, including a

telephone call to a number that had been linked to Bin Laden.  (*Id.*).  The agents also advised

al-'Owhali that they had found the bomb factory and displayed for him a color photograph of the

house.  (*Id.*).

After acknowledging that the agents "kn[e]w everything" (*Id.*, p. 26), al-'Owhali

announced that he "wanted to be tried in the United States . . . because the U.S. was his enemy,

not Kenya," and because there "would be press there and [h]e would be able to say why he did

what he did."  (*Id.*, p. 27; Ex. F, p. 96).  He then proposed, for the first time, that if the agents

could guarantee that he would be tried in the United States, he would confess everything about

his involvement in the embassy bombings.  The agents halted the interview, left the room, and

consulted with AUSA Fitzgerald about how to address al-'Owhali's demand for assurances of

prosecution in the United States.  (Ex. F, p. 97; Ex. G, pp. 27-28).  On Fitzgerald's instruction,

the agents then returned to the interview room and informed al-'Owhali that compliance with his

proposal would require coordination and that they would return with a response in the near future.  (Ex. F, pp. 28-29).

> vi.  **The August 22 Advice of Rights and Document of Understanding**

Early in the afternoon of the following day, August 22, AUSA Fitzgerald joined the agents in interviewing al-'Owhali.  (Ex. E, ¶ 32; Ex. F, p. 98; Ex. G, p. 161).  Fitzgerald began the session by presenting al-'Owhali with a proposed written agreement, called a Document of Understanding ("DOU"), that had been approved by Department of Justice officials in the United States and that attempted to respond to al-'Owhali's demand for a U.S. trial.  (Ex. E, ¶ 33; Ex. G, pp. 161-68; Document of Understanding, attached as Exhibit M).  During the initial discussion about the DOU, al-'Owhali made a comment to the effect of "maybe I should have an attorney look at this agreement to see that it is enforceable."  (Ex. E, ¶ 33; Ex. G, pp. 165, 214).  Significantly, however, al-'Owhali did not state that he wished to have an attorney, nor did he indicate any unwillingness to speak.  (Ex. E, ¶¶ 34-37; Ex. G, pp. 165-70, 173, 215, 217, 241-43).

In an abundance of caution, AUSA Fitzgerald orally advised al-'Owhali of his *Miranda* rights from memory, without employing the AOR form modified for overseas use.  Thus, Fitzgerald specifically told al-'Owhali through the interpreter that he had a right to have an attorney present "during this meeting," although there was no American lawyer available for him in Kenya.  (Ex. E, ¶¶ 34-37; Ex. G, pp. 165-66, 214-18, 241).  Fitzgerald advised al-'Owhali that if he decided to talk he could always change his mind and stop speaking even though he had already answered questions.  (Ex. E, ¶¶ 34-37; Ex. G, pp. 166, 173).  Fitzgerald also informed

17

al-'Owhali that if he talked, his statements could be used against him in court, but his decision to

remain silent could not. (Ex. E, ¶¶ 34-37; Ex. G, pp. 165-66, 214-18, 241). AUSA Fitzgerald

made clear that he was an attorney for the United States government, not for al-'Owhali. (*Id.*).

He repeatedly emphasized that at all times al-'Owhali was the "boss" about every aspect of the

interview, including and especially whether he wished to answer questions without a lawyer

present. (Ex. E, ¶ 33; Ex. G, pp. 152, 166). At the January 23, 2001, hearing, Fitzgerald

provided the following testimony regarding this advice of rights:

> I went through with him, saying . . . [y]ou have the right to
> have an attorney present during this meeting, and therein I
> specifically said, you should understand that I'm an attorney for the
> American government. I'm not your attorney.

> And then I said, and because there's no attorney available
> here for you during this meeting, you have to decide whether you
> are willing to talk to us and answer questions and deal with this
> document without an attorney present. And again, I would stress to
> him that decision is yours to make, you're the boss as to whether to
> answer questions or deal with this without an attorney present.

(Ex. G, pp. 165-66). Notes that Fitzgerald recorded shortly after the August 22 interview, which

were produced during discovery and introduced at the January suppression hearing, corroborated

the details of this testimony. (Ex. E, ¶ 61).

   After advising al-'Owhali of his rights, AUSA Fitzgerald proceeded to read the proposed

DOU slowly, through Language Specialist Feghali, so that al-'Owhali could decide whether he

wished to sign or discuss it without an attorney present. During AUSA Fitzgerald's reading of

the DOU, al-'Owhali interrupted to ask whether the agreement provided that he would be tried in

the United States. (Ex. E, ¶¶ 34-35; Ex. G, p. 167). Fitzgerald told him that the subject was

specifically addressed later in the DOU. Fitzgerald then proceeded to return to the reading of the

DOU word-for-word. At the conclusion of every paragraph, Fitzgerald asked al-'Owhali if he understood what had been explained to him, and each time al-'Owhali replied that he did. (Ex. E, ¶ 35; Ex. G, p. 167).

After AUSA Fitzgerald had read the portion of the DOU that provided that he would "make all best efforts to see that [al-'Owhali was] tried in the U.S.," al-'Owhali objected that he wanted a *guarantee* that he would be tried in the United States, not a commitment to make best efforts and *recommend* such a trial. (Ex. E, ¶ 36; Ex. G, p. 167; Ex. M). Fitzgerald explained that he could not purport to bind the United States, much less the Kenyan government, but stated he would consult with his supervisors about the possibility of a stronger assurance. (*Id.*). Despite the obvious importance of the meeting, "[v]oices were never raised." (Ex. E, ¶ 37). Fitzgerald later noted that "[i]f a stranger had walked into the room that day and observed the conversation, they would have had no idea that the person who was demanding an agreement (and negotiating a potential change to the agreement) was someone we believed had just committed the homicide of over 200 people." (*Id.*).

While AUSA Fitzgerald was responding to al-'Owhali's demand for a stronger commitment, Agents Gaudin and Bongardt remained in the interview room, where they ate lunch with al-'Owhali and discussed subjects unrelated to the investigation. (Ex. G, pp. 31-33, 95-96). During that conversation, al-'Owhali volunteered that he had developed sufficient trust of the agents that he believed they would do their best to secure him a U.S. trial, and he was therefore now willing to sign the DOU without the guarantee he had earlier demanded. (Ex. G, p. 96).

When AUSA Fitzgerald returned to the room, he confirmed once again that al-'Owhali was comfortable proceeding without an attorney. (Ex. E, ¶ 37). Al-'Owhali again

indicated that he was and stated that he wished to sign the agreement. (*Id.*). For the first time, al-'Owhali then revealed his true identity and instructed that the DOU should be changed to reflect his real name and Saudi citizenship. (*Id.*). Al-'Owhali signed the amended DOU. (*Id.*, Ex. G, pp. 169-70; Ex. M). When al-'Owhali signed that document — which contained the statement that he had been advised of his "right not to answer questions without a lawyer present" — he had been orally informed that he could "have an attorney present during this meeting" by Fitzgerald earlier that afternoon (Ex. G, pp. 165-67, 214-16), and had been asked three times whether he was comfortable proceeding without the assistance of an attorney: twice after Fitzgerald had read the agreement to him, and once more when he indicated his willingness to sign the agreement as first proposed.

The agreement signed, AUSA Fitzgerald turned to leave the room. (Ex. E, ¶ 38). Al-'Owhali told him to stay, saying that he wanted Fitzgerald to listen with the other agents as he recounted his whole story (including a song), through which, al-'Owhali explained, he would "further his cause" of bringing justice to his enemy. (*Id.*). Al-'Owhali proceeded to give what amounted to a full confession, encompassing everything from "growing up in Saudi Arabia to moving, to going over to Afghanistan, to his training, up through and including his participation in the bombing." (*Id.*; Ex. G, pp. 171-72). The agents asked very few questions that day, following al-'Owhali's instruction to permit him to tell his life story, uninterrupted, "from A to Z." (Ex. C; Ex. E, ¶ 38; Ex. G, p. 35).

vii.    The August 25 Kenyan Interview, the "Blue Chip Agreement,"
And Al-'Owhali's Removal to the United States

Interviews continued on August 23 and 24, but the agents noticed a change in al-
'Owhali's tone and demeanor.  Eager the day before to tell his story without interruption, al-
'Owhali now refused to discuss certain subjects and acknowledged that he was withholding
information that he thought would help the U.S. Government.  (Ex. E, ¶ 40; Ex. G, pp. 172-74).
Even though al-'Owhali had negotiated the DOU with the Government on the understanding that
he would tell all, AUSA Fitzgerald reminded him that the choice to speak remained entirely his,
that he was under no obligation to answer any questions, and that he was free to select which
questions he would entertain.  (*Id.*).  Al-'Owhali indicated that although he remained willing to
talk, he would not mention certain people, and the interviewers therefore avoided those topics.
(Ex. G, p. 173).

Twice on August 25, al-'Owhali further demonstrated his ability to direct the
circumstances of his interviews.  First, al-'Owhali refused to speak in response to the Kenyan
authorities' request that he provide them a statement.  Second, al-'Owhali indicated that he had
information critical to public safety but that he would share it only after he had arrived in the
United States.  (Ex. E, ¶¶ 50-51; Ex. G, pp. 97-98, 177-81).  AUSA Fitzgerald, concerned about
the risk that al-'Owhali's information could relate to an imminent terrorist attack, prepared a
second document of understanding in consultation with his superiors in the United States.  (*Id.*).
That document — termed the "blue chip agreement" based on Language Specialist Feghali's
characterization of the information to which it pertained (Ex. G, p. 97) — granted al-'Owhali

limited immunity for his statements. Al-'Owhali signed the agreement and provided the

information as agreed. (Ex. E, ¶¶ 51-54; Ex. G, pp. 179-81).

Al-'Owhali was transported by plane to the United States beginning in the

morning (Kenya time) on August 26. Once al-'Owhali was aboard the aircraft, AUSA Fitzgerald

informed him that he was in U.S. custody, and Agent Gaudin read him a standard advice of rights

form through Language Specialist Feghali. Al-'Owhali stated that he understood his rights,

signed the form, and requested that he be assigned a lawyer. On the morning of August 27,

al-'Owhali was taken to the Pretrial Services Office in the Southern District of New York, where

he told his interviewer that his occupation was a "student of terrorism." (Ex. E, ¶ 60).

### viii.   The Conditions Of Al-'Owhali's Interviews And Confinement

All Kenyan interviews with al-'Owhali were conducted in a library-like room with

tables and chairs at CID headquarters. (Ex. F, p. 17). Al-'Owhali did not wear handcuffs during

those interviews, nor did the American agents ever see him in handcuffs at any other time in

Kenyan custody. (Ex. G, pp. 18-19). The interviews ceased whenever al-'Owhali asked for time

to pray, to eat, to use the restroom, or simply to rest. (Ex. F, pp. 34-36, 53-56, 106-07, 162-63;

Ex. G, pp. 11-12, 85). He was given bottled water whenever he requested it. The American

agents provided him with newly purchased clothing when it became clear that the clothes he was

wearing might have evidentiary value. (Ex. F, pp. 39-40). Al-'Owhali also received medical

attention for his existing injuries and never appeared to have sustained any new ones. (*Id.*, pp.

38-40, 47, 111-12, 159-62).

On the nights of August 12 and 13, 1998, al-'Owhali slept in a cell at a police

station located in the Nairobi International Airport. (Affidavit of William J. Corbett, ¶ 4,

attached as Exhibit N). The cell measured eleven feet by twelve feet, with eight-foot ceilings, a

window, and a concrete bed. Kenyan officials transferred al-'Owhali to CID headquarters on

August 14, where he remained until his removal to the United States on August 26. (Ex. N, ¶¶ 4-

6). The room in which al-'Owhali was housed at CID headquarters had a window and a thin

mattress on which al-'Owhali slept under at least one blanket that Agent Gaudin provided him.

(Ex. F, pp. 41-43).

### 5.   Judge Sand's February 13 Decision

By opinion issued on February 13, 2001, Judge Sand denied al-'Owhali's motion

in relevant part, concluding that introduction at trial of all statements the defendant made after

receiving AUSA Fitzgerald's oral *Miranda* warnings would not violate the Fifth Amendment.

(Ex. L).

The Court began by adhering to its conclusion in the by-then-withdrawn January 9

opinion that the defendants, "as the present subjects of a U.S. criminal proceeding, are protected

by the Fifth Amendment's privilege against self-incrimination, despite their status as non-

resident aliens whose only connections to this country are their alleged crimes and their domestic

prosecution therefor." (*Id.*, p. 23). The Court held that, under these circumstances, "a

defendant's statements, if extracted by U.S. agents acting abroad, should be admitted as evidence

at trial only if the Government demonstrates that the defendant was first advised of his rights and

that he validly waived those rights." (*Id.*). Noting that the proper content of the warnings

regarding the right to counsel was complex in the overseas context (*Id.*, p. 27), the Court

concluded that "the fair and correct approach under *Miranda* is for U.S. law enforcement simply

to be clear and candid as to both the existence of the right to counsel and the possible impediments to its exercise." (*Id.*).

Against this backdrop, the Court concluded that the AOR read to al-'Owhali prior to questioning in Kenyan custody was "facially deficient in its failure to apprise [him] accurately and fully of [his] right, under *Miranda*, to the assistance and presence of counsel, even considering the fact that [he was] in the custody of foreign authorities." (*Id.*, p. 30). The Court explained that the message it inferred from the AOR was constitutionally deficient because it made the right to counsel "seem dependent on geography, when instead it actually hinged on foreign law." (*Id.*, p. 33). According to the Court, the AOR therefore "prematurely foreclose[d] the significant possibility that the foreign authorities themselves may, if asked, either supply counsel at public expense or permit retained counsel inside the stationhouse." (*Id.*, p. 31). Acknowledging that Kenyan law was "murky, at best," the Court saw "nothing in the Government's submissions that leads us to believe that, in Kenya, a suspect under interrogation is *always* banned from seeking the advice and presence of *retained* counsel." (*Id.*, pp. 31-32) (emphasis in original). Critical in this regard, the Court reasoned, was the "possibility that, if given the chance," the defendant "may have been able to retain counsel on [his] own." (*Id.*, p. 32). Because the AOR appeared, in the Court's estimation, to preclude that possibility, the defendant was "presented with an unduly constrained range of choices: [He] could either (1) remain silent or (2) go on to answer the American officials' questions without an attorney present." (*Id.*, pp. 32-33). For that reason, the District Court concluded, the AOR failed to comport with the Fifth Amendment as interpreted in *Miranda* and its progeny. (*Id.*, p. 33).

Applying these conclusions to the facts of al-'Owhali's interviews, Judge Sand suppressed all statements in the five sessions between August 12 and August 21, 1998, when he had received *Miranda* warnings based solely on the AOR.  The Court held admissible, however, all of al-'Owhali's statements beginning on August 22, 1998.  (*Id.*, pp. 34-37).  The Court found that on that day, AUSA Fitzgerald orally advised al-'Owhali of his *Miranda* rights and "*explicitly apprised* [him] that he had the right to the presence of an attorney for purposes of the ensuing conversations." (*Id.*, p. 35 (emphasis in original)).  The sole qualification that Fitzgerald placed on that right — the unavailability at that time of an American attorney — the District Court deemed "entirely true," and the Court further found that "no limits were expressed as to al-'Owhali's ability to retain Kenyan counsel if he wished to do so." (*Id.*).  Accordingly, the Court concluded, "AUSA Fitzgerald's oral advice of *Miranda* rights on August 22 cured the deficiency in the AOR so that" beginning on that day, "al-'Owhali was apprised of his rights in compliance with the requirements of *Miranda*." (*Id.* (citing, *inter alia*, *Oregon* v. *Elstad*, 470 U.S. 298 (1985))).

The Court further found that al-'Owhali's waiver of his rights was valid and voluntary.  The Court credited the testimony of Agent Gaudin and AUSA Fitzgerald regarding the circumstances of the interviews: the sessions were "intermittent and reasonable in duration; handcuffs were never used;" al-'Owhali was allowed breaks for prayer, restroom use, and food; al-'Owhali's demeanor was "one indicative of confidence, not of intimidation"; and his behavior demonstrated that he was "quite aware who was the 'boss' as to whether statements would or would not be made without a lawyer present." (*Id.*, p. 36).  In addition, for four reasons, the District Court concluded that the fact of al-'Owhali's "incommunicado" detention did not render

his waiver involuntary: Kenyan law permits such detention, the conditions of confinement were "far from oppressive," al-'Owhali was never mistreated or abused in any way, and he was interviewed only when he expressed his wish to speak. Indeed, the Court noted, "there is evidence that al-'Owhali regarded his sessions with S.A. Gaudin as a cat-and-mouse game between trained professionals." (*Id.*).

The District Court acknowledged language in the "blue chip agreement" that it had earlier read as supporting the inference that al-'Owhali faced a "Hobson's choice" compelling to speak as a condition of obtaining counsel. (*Id.*, pp. 36-37). But the evidence presented at the renewed suppression hearing, the Court concluded, convinced it "that what truly motivated al-'Owhali to inculpate himself was his own overriding desire that he be tried in the United States, which was his enemy, not Kenya." (*Id.*, p. 37). The Court therefore held admissible all of al-'Owhali's statements after August 22, 1998. (*Id.*).

### 6.    The Trial and Appeal

On May 29, 2001, al-'Owhali was convicted on all counts. The jury subsequently rejected the death penalty, and on October 18, 2001, al-'Owhali was sentenced to life in prison. The judgment — including Judge Sand's decision on al-'Owhali's suppression motion — was affirmed on appeal. *See In Re Terrorist Bombings Of Embassies In East Africa*, 552 F.3d 93 (2d Cir. 2008); *In Re Terrorist Bombings Of Embassies In East Africa (Fifth Amendment Challenges)*, 552 F.3d 177 (2d Cir. 2008).

**B.     The Disclosure Regarding the Interpreter**

**1.     Overview**

As described above, the Interpreter — an employee of a U.S. government agency (the "Government Agency") — translated during the first three days of al-'Owhali's interviews, before being replaced by FBI Language Specialist Feghali.  After Judge Sand's January 9 opinion suppressing the confession called into question the adequacy of the initial translation of the AOR, the Government interviewed the Interpreter, and considered calling her as a witness if the Court re-opened the hearing.  During these interviews, the Interpreter suggested that al-'Owhali was mistreated by the agents, but she later withdrew the allegation, and it was otherwise discredited, so no disclosure was made and the parties ultimately stipulated to her testimony.  The Interpreter's supposition regarding the sounds she heard during an al-'Owhali interview session resurfaced again, when she was interviewed by her employer earlier this year during a routine reinvestigation.  The Government disclosed a summary of these recent recollections that was prepared by her employer, but a videotape of the actual reinvestigation interview makes clear that the Interpreter's belief as to the nature of the sounds she heard is neither firmly held or reliable, as was the case when the Government considered calling her as a witness.

**2.     The Interpreter's Witness Preparation and the Stipulation**

To answer Judge Sand's questions regarding the adequacy of the translation of the AOR, AUSA Kenneth M. Karas interviewed the Interpreter in the presence of two lawyers working for the Government Agency.  (Affirmation of Leslie C. Brown, dated August 14, 2009, ¶ 3, attached as Exhibit O).  From the outset, the Interpreter expressed extreme reluctance to testify, mainly because she feared that al-'Owhali would learn her identity and her safety would

therefore be compromised. (*Id.*, ¶ 4). She was told that her testimony would likely be

mandatory, but that the Government would do its best to assuage her fear, by requesting that she

be permitted to testify in a light disguise or from behind a screen and using an alias. (*Id.*).

     With respect to her prospective testimony, the Interpreter described to AUSA

Karas the interview room and where the participants sat, recalling that she was separated from al-

'Owhali by a curtain, which was hung, at her request, to shield her identity from al-'Owhali. (*Id.*,

¶ 5). As a consequence, the Interpreter never saw al-'Owhali and he never saw her, but they

could hear each other. (*Id.*). Toward the end of AUSA Karas's interview, the Interpreter stated

that she heard a loud noise from the adjoining room, which led her to believe that al-'Owhali was

being beaten. (*Id.*, ¶ 6).

     AUSA Karas's initial reaction to the allegation was that it might be an effort by

the Interpreter to avoid testifying. (*Id.*). This was based not only on the Interpreter's adamant

aversion to testifying but on her demeanor as well. (*Id.*). Accordingly, AUSA Karas advised the

Interpreter that her testimony would be required regardless of what she heard; if she believed that

al-'Owhali was being beaten, that belief would not keep her off the witness stand. (*Id.*). AUSA

Karas told her that she should not assume there was a version of her story that would preclude or

guarantee her testimony and that all she had to testify to was the truth. (*Id.*)

     AUSA Karas then discussed the Interpreter's allegation with AUSA Fitzgerald

and United States Attorney Mary Jo White. (*Id.*, ¶ 7). It was decided that AUSA Fitzgerald

would interview Agent Gaudin while AUSA Karas would interview Detective Parola; the

interviews would be conducted separately and simultaneously and without notice as to the

subject matter. (*Id.*). In these interviews, Agent Gaudin and Detective Parola independently and

consistently recalled relevant parts of al-'Owhali's interviews and each denied that al-'Owhali was beaten. (*Id.*). AUSA Karas specifically recalled that Detective Parola recounted having slapped a water bottle, causing it to crash into a wall. (*Id.*).

When AUSA Karas met again with the Interpreter, her demeanor had changed markedly and, although still reluctant to testify, she no longer claimed to believe that al-'Owhali was beaten. (*Id.*, ¶ 8). The Interpreter now stated that she had no idea what had caused the loud noise and that it could have been caused by any number of things, including an object being thrown up against the wall or a person slamming his hand down on the table. (*Id.*). Given this clarification — presumably reflecting the Interpreter's renewed appreciation for the distinction between actual and supposed fact — as well as Agent Gaudin's and Detective Parola's credible denials and the absence of any allegation from al-'Owhali that he had been beaten, the Government concluded that there was no obligation to disclose the Interpreter's initial allegation to the defense. (*Id.*).

Prior to the subsequent session with the Interpreter (described above), counsel for al-'Owhali requested that the parties stipulate to the Interpreter's anticipated testimony. Defense counsel, aware that the Government was requesting that the Interpreter testify in light disguise or from behind a screen and using an alias, wanted to avoid those atmospherics and had concluded that a stipulation was in al-'Owhali's best interests. (*Id.*, ¶ 9). The Government did not immediately agree to the stipulation and proceeded to meet with the Interpreter for the purpose of determining whether she had any credible evidence that al-'Owhali was beaten. (*Id.*). After the Government had determined the Interpreter's view was consistent with the description of the interrogation by the agents, and in light of the fact al-'Owhali had never claimed to have been

physically abused by the agents, the Government contacted defense counsel and agreed to enter

into the stipulation that was admitted into evidence at the re-opened suppression hearing.  (*Id.*).

### 3.       The Reinvestigation Interview

In the fall of 2008, the Interpreter underwent a routine reinvestigation in order to

maintain her security clearances.  (Declaration of John Doe, dated June 11, 2009, ¶¶ 1-2, attached

as Exhibit P).  The reinvestigation was performed, in part, by a former criminal investigator (the

"Investigator") hired for such purposes by the Government Agency.  (*Id.*).  The Interpreter was

interviewed by the Investigator on three separate occasions.  (*Id.*, ¶ 2).  The reinvestigation

focused on internal matters unrelated to al-'Owhali.  (*Id.*, ¶ 3).  Each of the interviews was

videotaped and the recordings maintained by the Government Agency.  (*Id.*, ¶¶ 2, 5).

During the course of one of her interviews, the Interpreter stated that she had

translated during some of al-'Owhali's interrogation.  (*Id.* at ¶ 3; Transcript of Interpreter's

Reinvestigation Interviews, pp. 1, 4, attached as Exhibit Q).  She described the interrogation

room as set up in a way to shield her identity from al-'Owhali.  (Ex. P, ¶ 6).  When asked if

anything happened during the interviews that gave her any cause for concern, the Interpreter said

that she was very concerned al-Owhali not learn her identity.  (Ex. Q, at p. 1 ("the FBI . . . they

are covert . . . how [am I] going to cover myself?")).  Indeed, she repeated this concern throughout

the reinvestigation interviews, making clear that protecting her identity was her primary concern.

(*Id.*, pp. 1-3).

The Interpreter also stated that she heard banging during the interrogation which

only heightened her concern that her identity and personal safety might be compromised by al-

'Owhali.  (*Id.*, pp. 1-2)).  She explained that she had been worried about the banging because

"nobody looked out for [her]" and that she "had to look out for [her] own self" because the FBI

knew "how to shoot a gun" but she didn't.  (*Id.*).  With respect to the banging, she said that she

"jumped and . . . ran out and . . . was shaking [because] . . . this guy is going to come out and he

is going to find out who [I am]."  (*Id.*, p. 2).  The agents followed her out of the room and

explained that they were "swatting mosquitoes."  (*Id.*, p. 2).  She then returned to the room and

continued to translate for approximately three days, believing that the banging indeed was

unobjectionable.  She stated that upon her return, al-'Owhali said to her, "tell them to stop

beating me," but when asked if she actually thought al-'Owhali was being beaten, she said that

she "heard the banging but didn't see it" and "cannot tell . . . something I did not see."[5]  (*Id.*, pp.

2, 5).

### 4.      The Summary Disclosure

          In or about November 2008, lawyers for the Government Agency notified this

Office about the Interpreter's statements in the reinvestigation interview.  The lawyers indicated

that the substance of the interview was classified, but that a summary of the Interpreter's

statements regarding al-'Owhali would be provided to this Office.

          The Investigator prepared the summary, which he did from memory and without

referral back to the videotapes themselves.  (Ex. P, ¶¶ 3, 6).[6]  Among other things, the summary

stated that the Interpreter "believed that from sounds emanating from the interrogation room, al-

'Owhali was being beaten" and that she "ran from the room" when she heard al-'Owhali call out

---

          [5] At another point, after the Investigator pressed the issue, asking whether the Interpreter
thought al-'Owhali might have been beaten, she said, "Yea, in a way." (Ex. Q, p. 4).

          [6] The Investigator has acknowledged, in an attached declaration, that his summary was
unintentionally inaccurate.  (Exhibit P, ¶ 6).

"sister, sister, please make them stop beating me." (Summary of Interpreter's Interviews, attached as Exhibit R). A copy of the relevant excerpt of this summary (but not the videotapes) was provided by the Government Agency to this Office which, in turn, disclosed the summary to the defense.

### 5.       The Interpreter's Actual Statements

After the Second Circuit's remand, this Office was given access to the Interpreter's relevant files at the Government Agency, which contained, among other things, the videotapes of the Investigator's interviews of the Interpreter.[7] The videotapes contain the entirety of the Interpreter's statements regarding al-'Owhali; she made no statements regarding al-'Owhali's interrogation other than those captured on the videotapes. (Exhibit P, ¶ 5).

The videotapes demonstrate that the summary of the Interpreter's statements was largely inaccurate. Rather than claiming that she believed al-'Owhali was being beaten, the Interpreter — as was ultimately the case in her interactions with AUSA Karas — refused to speculate when pressed about the noises she heard and what may have caused them. (Ex. Q, p. 5). On the contrary, and again consistent with what she told AUSA Karas, the Interpreter stated that she "cannot tell you something I did not see." (*Id.*). And, rather than run from the room because of an alleged belief that al-'Owhali was being beaten, she ran because she was concerned that al-'Owhali was "going to come out and he is going to find out who [I am]." (*Id.*, p. 2).

---

[7] The videotapes are classified. A copy of the relevant portion of the videotapes will be made available by an employee of the Government Agency for presentation to the Court and defense counsel upon request. (Videotape of Interpreter's Reinvestigation Interviews, Exhibit S). A transcript of the relevant portion of the videotapes has been prepared. The transcript is unclassified and is attached as Exhibit R.

32

C.     **Al-'Owhali's Motion for Remand**

Al-'Owhali moved in the Second Circuit for remand based on the summary

disclosure of the Interpreter's statements.  In his motion, al-'Owhali did not claim to have been

beaten during his interviews.  What al-'Owhali claimed — through his lawyer and not in a sworn

statement — is that one of the agents "squeezed his wrist" which "inflicted pain" but "did not

amount to torture," and that he asked her to "tell them to stop hurting me."  (Affirmation of

Frederick H. Cohn, dated April 14, 2009, ¶ 6, attached as Exhibit T).  Importantly, al-'Owhali

makes no claim that the alleged squeeze had a coercive impact on his decision to speak with the

agents.

### DISCUSSION

There are a variety of reasons why the Interpreter's recent statements in her

reinvestigation interview are not sufficient to merit re-opening the suppression hearing in this

matter.  First, as a matter of perspective, the Interpreter's comments are the sole suggestion in

this case that al-'Owhali was beaten by the agents who interviewed him.  The defendant himself

has not made such a claim, even after learning of the Interpreter's suggestion.  Judge Sand,

moreover, after hearing from multiple witnesses, and reviewing a number of submissions, had no

concern that al-'Owhali was beaten; on the contrary, the Court found that al-'Owhali was not

mistreated or abused in any way.  (Ex. L, p. 36).

It is beyond dispute that the Interpreter did not see what was happening in the

interview room, as she was cordoned off by a curtain.  Her assertion, when boiled down, is solely

that she heard banging and, later, an exclamation from the defendant that she remembered as a

request of her to make the agents stop beating him.  Clearly, the Interpreter has grappled with the

task of trying to interpret the meaning of these sounds — in interviews with both the Government

and the Investigator — but in each case she has settled on the conclusion that there are many

possible explanations, no one more plausible than the next. Most recently, the videotape of the

Investigator's interview demonstrates — contrary to the summary upon which the remand was

premised — that she *could not* conclude with any measure of certainty that al-'Owhali was being

beaten. Thus, putting aside questions about her credibility on this point — which are serious, in

the Government's view — it seems apparent that the Interpreter is simply not in a position to

provide testimony that would carry sufficient weight to justify disturbing Judge Sand's finding on

voluntariness.

   The summary disclosure, unfortunately, treats the Interpreter's recollections about

al-'Owhali as more alarming — and credible — then they were. In actuality, based on the

videotape, the Interpreter refused to speculate about the sounds and their causes, ultimately

acknowledging that she could not opine on something she did not see. The Interpreter did recall

in the reinvestigation interview that al-'Owhali said to her, "sister, please make them stop beating

me," but the summary disclosure incorrectly suggests that she gave the statement credence,

stating that she ran from the room after hearing it. In actuality, the Interpreter said that she heard

that statement only after *returning* to the room, and apparently did not react to it in a way that

would suggest she actually believed al-'Owhali. More importantly, al-'Owhali — who, again,

has never alleged that the agents beat him — has made clear, through counsel, that he did not use

the word "beating"; rather, he asked the Interpreter to help stop the agents from "hurting" him

when at one point they "squeezed his wrist." (Ex. T, ¶ 6). Given that this one squeeze of the

wrist occurred, if at all, at least eight days before al-'Owhali actually confessed, and that al-

'Owhali does not claim that it had any coercive impact on his decision to confess, a re-opening of the suppression hearing hardly seems necessary — there is simply no genuine issue of material fact related to the voluntariness of al-'Owhali's confession to be resolved.

A post-conviction hearing is necessary only when a defendant asserts disputed facts he could establish. *United States* v. *Stantini*, 85 F.3d 9, 17 (2d Cir. 1996) (hearing warranted only where genuine issue of material fact is presented); *United States* v. *Aiello*, 814 F.2d 109, 113 (2d Cir. 1987). And, "[w]here the petitioner has already had a full evidentiary hearing upon the same claim and" — like al-'Owhali — "seeks another hearing on grounds of newly discovered evidence, greater specificity is required than if no hearing had been held." *United States* v. *Dalli*, 491 F.2d 758, 761 (2d Cir. 1974).

In *Dalli*, the Second Circuit endorsed a district court's refusal to re-open a suppression hearing on collateral review, where the supposed newly discovered information was "vague, indefinite, and conclusory but marbled with hearsay." *Id*. That is precisely the case here. The Interpreter has made clear that she does not know whether al-'Owhali was beaten and any more definitive suggestion from her would not only be surmise, but it would contradict what al-'Owhali himself has claimed. *Id.* ("petitioner's and government's affidavits – taken together – are used to determine the existence of genuine issues of material fact"). There is no competent evidence on which al-'Owhali might rely to overturn Judge Sand's voluntariness finding. *See United States* v. *Aiello*, 814 F.2d at 113 ("application must contain assertions of fact that a petitioner is in a position to establish by competent evidence").

Al-'Owhali has been convicted of horrible crimes. The appellate court has basically rejected his appeal. He is looking at spending the rest of his life in prison under less

than ideal conditions.  While understandable that al-'Owhali would try to make use of the summary disclosure, the fact remains that the totality of this new evidence does nothing to cause doubt on Judge Sand's findings of voluntariness.  But the law is clear that "an evidentiary hearing is not held to afford a convicted defendant the opportunity to conduct a fishing expedition."  *United States* v. *Jordan*, 591 F.2d 686, 711 (S.D.N.Y. 2008) (quoting *United States* v. *Stewart*, 433 F.3d 273, 306 (2d Cir. 2006)).  There must be competent evidence that raises a genuine issue of material fact, and that is not the case here.[8]

\* \* \*

For all of the foregoing reasons, the Government respectfully requests that this Court enter an order finding there is no basis on which to question the voluntariness of al-'Owhali's confession and thus no need for any further proceedings in this matter.

Respectfully submitted,

PREET S. BHARARA
United States Attorney
Southern District of New York

By:     /s/ Leslie C. Brown
Leslie C. Brown
Assistant United States Attorney
(212) 637-2638

cc:     Frederick H. Cohn, Esq. (Federal Express)

---

[8] In the event the Court decides the present record is insufficient to resolve the question of whether al-'Owhali's confession was coerced through physical abuse, the Government respectfully requests the opportunity to put additional evidence before the Court.